***********
The Full Commission has reviewed the Deputy Commission's Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission AFFIRMS the Opinion and Award of Deputy Commissioner Holmes with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act at all relevant times.
2. The employer-employee relationship existed between the parties.
3. RSKCo was the carrier on the risk on the date of the injury by accident.
4. On December 3, 1998, plaintiff sustained an injury by accident to his back arising out of and in the course of his employment.
5. Plaintiff has been out of work due to his injury by accident and has received temporary total disability benefits continuously since December 3, 1998 at the rate of $256.95 per week, based on an average weekly wage of $385.42.
6. The parties stipulated the following documentary evidence at the hearing before the Deputy Commissioner:
a. Stipulated Exhibit #1: medical records.
7. Defendants entered the following exhibits into evidence: job description; videotape of plaintiff's Functional Capacity Evaluation on January 6, 2003; various I.C. forms and pleadings.
9. The following depositions were received into evidence: Jamie Clark Hupp, Randy Owen Kritzer, M.D., J. Keith Miller, M.D., and Mary K. O'Neill.
10. The issues before the Commission are whether benefits are due plaintiff as a result of his compensable injury; whether plaintiff has received the correct amount of temporary total disability compensation; and whether plaintiff continues to be totally disabled as a result of his injury.
 ***********
Based upon all of the evidence produced at the hearing, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff suffered a compensable injury to his back on December 3, 1998 while breaking out concrete and fixing a connection pipe. His claim was accepted on a Form 60 and defendants provided medical treatment. Plaintiff was diagnosed with herniated nucleus pulposis (HNP) of the lumbar spine at L4-5.
2. Plaintiff underwent conservative medical treatment with a number of different doctors and physical therapy providers. In August 1999, plaintiff was released by his treating physician, Dr. Charles Rawlings at Forsyth Neurosurgical Associates, at maximum medical improvement and assigned a 20% permanent partial impairment rating. Dr. Rawlings did not think that surgery was indicated. Plaintiff was assigned a lifting restriction of 30 pounds.
3. Plaintiff did not return to work. In March 2001 plaintiff sought opinions from other doctors regarding possible surgery. He was seen on March 19, 2001 by Dr. Del Curling at Winston Neurological and Spinal Surgery Associates. On follow-up from this visit, plaintiff was seen by Dr. Leon Dickerson at Charlotte Orthopedic Specialists beginning in July 2001. Testing revealed no clear explanation for plaintiff's alleged complaints of pain and on August 9, 2001, Dr. Dickerson stated plaintiff was not a candidate for surgery. He recommended a Functional Capacity Evaluation (FCE) for plaintiff at that time.
4. An FCE was scheduled for September 14, 2001 at plaintiff's attorney's office. Plaintiff arrived at the office, but then refused to participate in the FCE. Plaintiff alleges that he was in too much pain to perform the FCE. Dr. Dickerson stated that plaintiff was at maximum medical improvement, could return to work, and had no disability to his back.
5. Defendants filed a Form 24 Application seeking to terminate plaintiff's benefits due to the release to full duties by Dr. Dickerson. The Form 24 was denied by Order dated October 29, 2001, but the denial included an Order requiring plaintiff to attend and participate in an FCE. That Order was never appealed by plaintiff.
6. On December 28, 2001, plaintiff was seen by Dr. Randy Kritzer for evaluation. Dr. Kritzer recommended that plaintiff undergo surgery. Dr. Kritzer performed a bilateral L4-5 microdiscectomy, followed by Ray cage interbody fusion on March 28, 2002. An MRI in July 2002 showed excellent decompression and good location of cages. Despite these results, plaintiff continued to complain of pain. Dr. Kritzer ordered another FCE to be performed. Dr. Kritzer confirmed that at the time he recommended the FCE, he told plaintiff the purpose of the FCE was to get him back to work.
7. Jamie Clark Hupp, an exercise physiologist employed by PhysioMetrics, performed the FCE on plaintiff at his attorney's office on January 6, 2003. Ms. Hupp began the FCE by trying to take plaintiff's vital signs. However, plaintiff refused to wear a heart rate monitor. He also refused to have his temperature taken. Ms. Hupp stated she did not get through all the activities she would normally have an individual perform during an FCE because plaintiff refused to participate. He refused to perform the pulling and toe standing activities. For the pulling activity, the minimum amount of force that can be measured by the Dynamometer is zero pounds. Plaintiff pulled zero pounds, reflecting that he did not try to pull one pound. The toe standing activity consists of standing on one's tiptoes as high as possible. Plaintiff also refused to try the floor-to-waist lifting exercise. He claimed he was unable to even take one step up on a block. Plaintiff did some cervical range of motion, but then stated he needed to take a break and lie down. Plaintiff refused to attempt any further exercises.
8. After being informed of plaintiff's lack of performance during the FCE, Dr. Kritzer testified there was no physical medical reason for plaintiff's refusal to participate in the FCE. Dr. Kritzer explained "[t]here was nothing on his MRI scan, in my opinion, to be causing him severe pain as he was complaining of." Dr. Kritzer would not have sent plaintiff for the FCE if he had thought plaintiff was not capable of completing it.
9. On May 16, 2003, Dr. Kritzer found that plaintiff was at maximum medical improvement and he assigned plaintiff a 12% permanent partial impairment rating to the back. Dr. Kritzer released plaintiff to return to work in "at least" a sedentary work environment and assigned work restrictions of no lifting over 50 pounds on an occasional to moderate basis, with frequent changes of position. Dr. Kritzer testified plaintiff did not need to lie down during the day. He assigned no limitations on plaintiff's ability to drive or to ride as a passenger in a vehicle. While Dr. Kritzer confirmed that plaintiff would need to gradually increase the number of hours he worked per day in the beginning, this restriction was only temporary. Dr. Kritzer expressed the opinion that plaintiff was capable of returning to work in the competitive labor market. When asked whether the FCE gave him any assistance in determining whether plaintiff could work, Dr. Kritzer stated "It helped me by giving me a hint regarding his motivation [and] that he was not particularly motivated to work"
10. Plaintiff was subsequently seen by Dr. J. Keith Miller, a neurologist in High Point. Dr. Miller is not a surgeon, is not board certified in surgery, has never performed surgery of any kind, and has never performed a lumbar fusion. He first saw plaintiff on October 3, 2003, after the surgery by Dr. Kritzer. Plaintiff went to Dr. Miller for assistance with his application for Social Security Disability Insurance. Dr. Miller never received approval from either the workers' compensation carrier or the Commission to treat plaintiff. Dr. Miller's examination resulted in diagnoses of failed back syndrome from plaintiff's prior operation and polyneuropathy.
11. Dr. Miller stated and the Commission finds that plaintiff's polyneuropathy was not in any way related to his failed back syndrome.
12. Dr. Miller believed that plaintiff was incapable of any work. Dr. Miller testified that he felt plaintiff's disability was related to his failed back syndrome. Dr. Miller did not place any limitation on plaintiff's ability to walk or ride a bicycle. Dr. Miller confirmed that the primary bases of his opinion of total disability were (1) plaintiff's complaints of pain, and (2) what he witnessed about the way plaintiff moved and acted. On cross-examination, however, Dr. Miller admitted that both of these things were wholly within the control of the plaintiff and were dependent upon plaintiff being truthful.
13. With regard to medical treatment, Dr. Miller confirmed that plaintiff's practice of taking Darvocet with a few beers was expressly contraindicated in the Physician's Desk Reference (PDR). Dr. Miller went on to state that, despite plaintiff's alleged severe pain, plaintiff stated he "was not interested" in trying additional treatment to improve, such as a dorsal column stimulator or a pain clinic. With regard to the FCE, Dr. Miller expressly stated, "I think that Mr. White did not participate to the extent that we can really even say from that exam what his true limitations or abilities are based on that FCE alone."
14. Plaintiff testified at the Deputy Commissioner's hearing that he has not worked and has had no income other than workers' compensation benefits since his injury in December 1998. Further, plaintiff confirmed he has not looked for any work since May 2003 when Dr. Kritzer gave him the 50 pound lifting restriction, other than making a casual inquiry with a friend, Arnold Rose, who runs a service station near plaintiff's residence. Plaintiff offered to work for Mr. Rose for four hours a day at $20.00 per day as an office assistant/money collector, which was similar to the job Mr. Rose's father previously performed. Mr. Rose did not hire plaintiff for that position.
15. Plaintiff does not pay rent and does not have car or utility payments. Plaintiff does not have any medical restrictions from driving, however, he has not sought to obtain a new driver's license since it was revoked in 1985. Plaintiff had no explanation why he did not have money for public transportation to and from work.
16. Upon waking, plaintiff does a number of physical exercises. These include three sets of ten repetitions each of leg lifts while on his back with his legs straight out and raised six inches above ground level. He then remains on his back and completes three sets of ten repetitions each of chest presses with arm weights. He does three sets of ten repetitions each of abdominal crunches, and three sets of ten repetitions each of straight-arm raises.
17. On a daily basis, plaintiff bikes or walks to Clemmons to visit a country store and his service station friend, Mr. Rose. The trip is approximately two and a half miles each way and it takes him 30 40 minutes to make the trip.
18. Plaintiff described no real improvement in his pain complaints since his surgery in March 2002. He does not want to go through pain management and is happy with his medication regimen consisting of Darvocet and beer. Plaintiff said he would not try to return to work because he does not think he can work a full shift.
19. An initial vocational evaluation and labor market survey was done for plaintiff by Mary O'Neill, a vocational counselor for Southern Rehabilitation Network, Inc. Ms. O'Neill confirmed plaintiff was a high school graduate who had taken community college courses. Based on her evaluation, Ms. O'Neill explained that plaintiff had "a lot of transferable skills." These included such things as planning, following instructions, operating equipment, reading blueprints, learning procedures and techniques, as well as the ability to visualize finished products and accept responsibility for the accuracy of the work done. Ms. O'Neill then performed market research on jobs available for an individual with plaintiff's skills and limitations. Through the Employment Security Commission, Ms. O'Neill identified a number of jobs over the period of several weeks that were appropriate for plaintiff. These jobs included such things as cashier, assistant manager of a convenience store, service station attendant, assembler, car window tint installer, machine operator, and dietary aide. The pay rates for these jobs ranged from $7.00 to $8.00 per hour. While Ms. O'Neill acknowledged that there were some potential obstacles to employment, such as the lack of a drivers' license and use of pain mediations, she confirmed there was nothing to indicate that plaintiff was not capable of either obtaining a license or working a full day.
20. Based on her analysis, Ms. O'Neill expressed the expert vocational opinion that there is suitable work available for plaintiff in the Forsyth County area. She stated it would be worthwhile for plaintiff to look for work and it would not be futile for him to do so. There was no other expert vocational testimony.
21. Plaintiff's testimony regarding the extent of his pain and disability is not deemed credible by the Commission. Plaintiff's daily routine shows that he is capable of performing substantial physical activities on a regular basis on a set routine and schedule as required for competitive employment. The greater weight of the evidence shows that after Dr. Kritzer released plaintiff to return to work on May 16, 2003, plaintiff was no longer disabled and had regained wage earning capacity.
22. The Full Commission gives greater weight to the opinions and testimony of Dr. Kritzer than that of Dr. Miller. Dr. Kritzer is board certified in neurosurgery. He was plaintiff's treating physician and performed surgery on plaintiff. He also saw plaintiff more frequently and over a greater length of time. In addition, Dr. Miller did not do any independent testing of plaintiff's abilities and did not perform or prescribe an FCE.
23. Defendants state on the Form 19 that plaintiff's hourly rate was $10.25. Defendants did not submit a Form 22. Plaintiff worked approximately 50 hours per week, depending on the weather. Plaintiff was paid time and a half for overtime. Based on the greater weight of the evidence, plaintiff's average weekly wage was $563.75, yielding a compensation rate of $375.85. Defendants underpaid compensation to plaintiff from December 3, 1998 through May 16, 2003 in the amount of $118.90 per week.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On December 3, 1998, plaintiff sustained a compensable injury by accident arising out of and in the course of the employment. N.C. Gen. Stat. § 97-2(6).
2. Defendants admitted the compensability of plaintiff's injury by accident on December 3, 1998 by filing a Form 60. The Form 60, however, does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff.Sims v. Charmes/Arby's Roast Beef, 142 N.C. App. 154,542 S.E.2d 277 (2001).
3. In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally incapable of work in any employment as a result of the work-related injury; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. PerdueFarms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993) (citations omitted). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms., Inc., supra.
4. In the instant case, plaintiff has not met his burden of showing disability after May 16, 2003. The greater weight of the evidence is that plaintiff is not medically precluded from earning wages. Plaintiff has not made a reasonable job search and the greater weight of the evidence is that a job search would not be futile for plaintiff. Therefore, plaintiff is no longer disabled within the meaning of the North Carolina Workers' Compensation Act and is not entitled to temporary total disability after being released to return to work by Dr. Kritzer on May 16, 2003. Russellv. Lowes Product Distribution, supra.
5. Plaintiff's average weekly wage was $563.75, yielding a compensation rate of $375.85. Plaintiff is entitled to $118.90 per week from December 3, 1998 to May 16, 2003 for the underpayment of compensation based on the incorrect average weekly wage.
6. Plaintiff is entitled to compensation of $375.85 per week for 36 weeks for his 12% permanent partial disability rating to his back. N.C. Gen. Stat. § 97-31(23). Defendants are entitled to a credit against this amount for any temporary total disability payments made to plaintiff after May 16, 2003, but adjusted to reflect the prior underpayment of compensation to plaintiff based on the incorrect average weekly wage.
7. Plaintiff is entitled to payment for any medical treatment related to his original back injury for so long as said treatment effects a cure, gives relief, or tends to lessen plaintiff's period of disability. Defendants, however, are not required to pay for any treatment related to plaintiff's polyneuropathy.
 ***********
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. As of May 16, 2003, plaintiff was no longer disabled within the meaning of the Act and therefore is not entitled to compensation benefits after May 16, 2003.
2. Defendants shall pay plaintiff permanent partial disability benefits at the rate of $375.85 per week for 36 weeks for the 12% permanent partial disability impairment to plaintiff's back. This amount has accrued and shall be paid in a lump sum.
3. In addition to the 36 weeks of permanent partial disability compensation awarded in paragraph 2 above, defendants shall pay plaintiff $118.90 per week for the period December 3, 1998 to May 16, 2003 for the underpayment of temporary total disability compensation based upon the incorrect average weekly wage. This amount has accrued and shall be paid in a lump sum. However, these amounts are subject to a credit for any temporary total disability compensation paid by defendants to plaintiff after May 16, 2003.
4. Defendants shall pay for all medical treatment incurred or to be incurred for plaintiff's back as a result of his compensable injury of December 3, 1998. The approved expenses include treatment by Dr. Miller arising from plaintiff's December 3, 1998 back injury. Defendants are not required to pay for any treatment for plaintiff's polyneuropathy.
5. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in paragraph 2 above is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs, including an expert witness fee of $325.00 to Dr. Miller and $400.00 to Dr. Kritzer if not paid by prior order.
This the 18th day of March 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ PAMELA T. YOUNG COMMISSIONER